HALL, Judge.
This suit arises out of an accident which occurred when plaintiff’s automobile was struck by a tractor-trailer rig overtaking her from behind as she slowed and commenced to make a left turn off the highway into her driveway. After trial, the district court found that Hall, the driver of the tractor-trailer rig, was negligent and that plaintiff was contributorily negligent, barring her recovery. Plaintiff appealed from the judgment dismissing her suit. Finding that the trial court erroneously held that plaintiff was guilty of contributory negligence which was a cause of the accident, we reverse and award plaintiff damages.
The accident occurred on September 25, 1979 at about 5:30 p. m. Plaintiff, Annie Mae Jones, and several members of her family had been shopping in Coushatta and were returning home via U.S. Highway 71. Plaintiff’s home is located on Highway 71 about three miles south of Coushatta. Hall, driving a tractor-trailer rig pursuant to a contract with defendant North American Van Lines, left Coushatta about the same time as plaintiff and, like plaintiff, was traveling south on Highway 71. The rig was some distance behind plaintiff’s vehicle which was maintaining an average speed of about 40 miles per hour.
As plaintiff neared her driveway she put on her brakes to slow for the left turn into her drive. Plaintiff activated her left-turn indicator when she was 100-120 feet from the driveway. As plaintiff began her turn, her vehicle was struck from behind by the tractor-trailer rig. The scene of the accident lies within a no-passing zone, marked by double yellow stripes on the highway, which extends seven hundred feet north of the point of impact near plaintiff’s driveway and some distance beyond.
Defendant Hall testified that he left Coushatta, was proceeding south on Highway 71, and that the Jones vehicle was being driven in an erratic manner in that it was being driven at varying speeds ranging from 25 to 45 miles per hour. Hall testified he had been following the Jones vehicle for a couple of miles when Jones slammed on her brakes and Hall, in order to avoid an accident, veered to the left. At that time, the Jones vehicle began to accelerate and was also veering to the left, forcing the tractor-trailer rig to veer left toward the shoulder of the road. Hall claimed that the point of impact was in the northbound lane about one foot from the shoulder. The *525 investigating state trooper stated in the accident report that he also considered this to be the point of impact.
Mrs. Jones testified that she slowed for the turn about 300 feet from her driveway and activated her left-turn indicator when she was 100-120 feet from the driveway. At this point, she looked in the rear view mirror and saw the Hall vehicle was approximately 300 feet behind her. She testified she had barely begun her turn when Hall’s rig struck her vehicle on the left rear bumper, causing the car to turn, and then hit plaintiffs vehicle in three other places with the greatest damage occurring to the left front fender. These facts were corroborated by plaintiff’s daughter, a passenger in the vehicle, and by two disinterested eyewitnesses. These witnesses also testified that the Hall vehicle was traveling too fast and would have hit plaintiff’s vehicle whether she had turned or not.
The recited testimony and facts clearly support the trial court’s determination that Hall was negligent in following too closely, being inattentive, failing to reduce his speed, and in attempting to pass in a no-passing zone.
The trial court found that plaintiff was negligent in making a left turn without checking for overtaking traffic, even though both plaintiff and defendant were traveling in a no-passing zone, and that her negligence was a cause of the accident. The trial court’s analysis and application of the law would be correct if plaintiff’s attempt to turn left caused the accident. However, the testimony of plaintiff and the disinterested eyewitnesses, as well as the photographs in evidence showing the damage to plaintiff’s vehicle, establish that plaintiff’s action in beginning to make a left turn was not a cause in fact of the accident.
It is correct, as argued by defendant and as held by the trial court, that a left-turning motorist has a duty to check for passing traffic before actually commencing a left turn by turning across the center line. If an overtaking vehicle is already in the passing lane at the time the left-turning motorist actually commences the turn, then the left-turner is negligent in making the turn at a time when it is unsafe to do so. Choate v. Louisiana Farm Bur. Mut. Ins. Co., 384 So.2d 511 (La.App. 2d Cir. 1980); Songe v. Highlands Insurance Company, 336 So.2d 243 (La.App. 1st Cir. 1976). However, this case is essentially a rear-end collision case and not a left-turn case. Plaintiff did not turn into the path of a vehicle which was already fully in the passing lane. This rear-end collision was caused by the overtaking truck driver’s failure to slow down when plaintiff slowed and gave her left-turn signal, making the rear-end collision inevitable regardless of whether plaintiff turned across the center line and regardless of the truck driver’s efforts to pass on the left to avoid a collision.
The eyewitnesses testified that the Hall vehicle was about to hit plaintiff’s car when the truck suddenly veered to the left. Hall’s testimony that when plaintiff slowed down near her driveway he had to take evasive action to avoid hitting her vehicle indicates that he was following too closely and, therefore, was unable to slow down and avoid colliding with the rear of plaintiff’s car. Hall testified he did not see the left-turn signal, although he admitted it was on after the collision. Although Hall took evasive action by trying to pass plaintiff’s car on the left, it is purely speculative to assume that he could have safely passed on the left if she had not begun to cross the center line of the highway. It is more probable than not that the tractor-trailer rig would have hit plaintiff’s car whether she crossed the center line or not. Further, it was not established that the rear of plaintiff’s car was across the center line at the time the rig hit her rear bumper; to the contrary, several witnesses testified that the front part of plaintiff’s car was only slightly across the center line when the initial impact occurred.
Nor is it established that had plaintiff checked again for overtaking traffic at the last moment before crossing the center line that she could or should have seen the tractor-trailer rig in the passing lane. The two *526 eyewitnesses testified that the rig was right behind plaintiffs vehicle as plaintiff slowed for her turn and that the rig veered left, straddling the center line, only moments before the collision. The testimony of the eyewitnesses and of plaintiff also indicates that the point of impact was at or near the center line of the highway and that, therefore, the tractor-trailer rig was not completely in the passing lane when the impact occurred. Although the investigating trooper’s report placed the point of impact in the northbound lane one foot from the shoulder, the trooper had no independent recollection of the accident and was unable to testify what physical evidence lead him to that conclusion. Consequently, in view of the contrary eyewitness testimony regarding initial point of impact, we attribute little weight to the trooper’s determination of point of impact. The initial impact was on the left rear bumper of plaintiff’s car, and after the right front wheel of the truck also hit her left rear fender and the driver’s door, the main impact to the left front fender could well have been near the shoulder of the northbound lane.
When plaintiff braked, slowed and activated her left-turn indicator, all in accord with safe-driving practices, all of the forces were in motion for a rear-end collision to ensue because of Hall’s inattention, excessive speed, following too closely, or a combination of these factors. The weight of the evidence is that the truck did not move into the passing lane until the impact was imminent. Further observation of overtaking traffic by plaintiff would not have prevented the collision and the fact that plaintiff had begun to execute a left turn by slightly crossing the center line did not contribute to the accident.
For these reasons the trial court erred in finding plaintiff contributorily negligent and in dismissing her suit. We reverse his judgment and award plaintiff damages.

Quantum

Immediately after the accident, plaintiff was taken to the emergency room of Huc-kaby Memorial Clinic in Coushatta where she complained of neck and back pain. The problem was initially diagnosed as mild whiplash and plaintiff was given pain medication and sent home. The following day, September 26, 1979, plaintiff saw Dr. Willis in Coushatta, reporting severe neck and back pain. An X ray of the cervical spine area was taken and plaintiff was given pain relief medication and a muscle relaxant.
Dr. Willis referred plaintiff to Dr. Dean, an orthopedic surgeon practicing in Shreveport, who examined plaintiff on September 26 and diagnosed plaintiff’s injury as a cervical sprain with a contusion of the right thumb and wrist. Dr. Dean advised plaintiff to continue with the medication prescribed by Dr. Willis, maintain bedrest and to apply heat to the sore muscles of the back and neck area. Plaintiff continued to see Dr. Willis about once a week through December 1979 with continued complaints of neck and back pain. Plaintiff returned to Dr. Dean in late December 1979 still complaining of wrist and back pain and also complaining of some numbness in her legs. X rays of the lumbar spine showed no definite abnormalities. She was instructed to return if she continued to have difficulties with her legs. Dr. Dean saw plaintiff again on January 21, 1980. She was still having neck and back pain and numbness in the left leg. Dr. Dean had her admitted to the hospital for a myelogram, but because of an insurance problem the myelogram was not done. Dr. Dean did not see plaintiff again. At the time he last saw her he was of the opinion she should have already been well.
In late December 1979, plaintiff was also suffering symptoms of a urinary tract disorder. She was hospitalized in Coushatta during the first week of January 1980 for musculoskeletal pain as well as for the urinary tract disorder. Most of the testing, examination and procedures completed during this hospital stay were directed toward the urinary tract disorder rather than plaintiff’s back problems. Dr. Turner, a neurologist, testified, in effect, that the urinary tract disorder could not be related to the accident.
In mid-November 1979 plaintiff began to see a psychiatrist, Dr. Williams, complain *527 ing that she had been having constant headaches since her automobile accident, had been restless at night with much trouble sleeping, and had suffered a loss of appetite. Plaintiff felt that she was unable to return to her job as a bookmobile driver and this contributed to her overall depression. On later visits to Dr. Williams plaintiff reported that she had frequent dreams of the automobile accident and continued to have problems with headaches, sleeplessness and lack of energy. Dr. Williams’ diagnosis was that plaintiff experienced a traumatic neurosis and depression as a result of the accident. He prescribed medication.
During these visits, which continued through April 1980, plaintiff complained to Dr. Williams of her neck and lower back pain and of some numbness in her left leg and also pain and numbness in her right wrist. Dr. Williams referred plaintiff to Dr. Long, a neurosurgeon, to check for a possible lumbar disc problem. After plaintiff was treated by Dr. Long, Dr. Williams on March 10 found that plaintiff’s mental status had greatly improved and that she had no signs of depression. When Dr. Williams next saw plaintiff on April 10 he found she was doing well with no symptoms of depression. He began withdrawing her from the medication. On May 5 she was doing excellently and was told she need not come back. Dr. Williams was of the opinion that she was disabled and unable to work due to pain from the time he first saw her until the March 10, 1980 visit. He examined plaintiff again shortly before trial and was still of the opinion she could work.
Plaintiff first saw Dr. Long on February 18, 1980, complaining of pain in her back and down her left leg. There was also some numbness in her left leg. Dr. Long felt that plaintiff’s headaches were caused by a flexion extension injury to the neck. He noted some tenderness in the suboceipi-tal area and some muscle spasms in the neck as well as in the low back region. Dr. Long ordered a myelogram and plaintiff was admitted to Doctors’ Hospital in Shreveport on February 24, 1980. The my-elogram disclosed a small defect on the right at the L5-S4 disc space. This was enigmatic because the leg pain and numbness were on the left. Dr. Long concluded that plaintiff had a disc problem in the lumbar area of her back, and cervical spon-dylosis aggravated by whiplash in the upper back and neck. Plaintiff was treated conservatively and was discharged from the hospital on March 1, 1980. Dr. Long next saw plaintiff on March 31, 1980. Plaintiff still had left leg pain although the pain in the low back and leg was somewhat improved. Muscle spasms were noted in her back. Dr. Long prescribed a lumbrosacral corset and referred plaintiff to a physical therapist to be fitted with a transcutaneous electrical nerve stimulator (TNS unit).
In June 1980, Dr. Long addressed himself to the carpal tunnel syndrome symptoms which plaintiff had been experiencing in her right wrist for several months and for which she had been wearing a wrist brace. A nerve conduction test was done by Dr. Brown, a neurologist, who found delayed nerve reactions in both wrists. On July 23 plaintiff was admitted to Doctors’ Hospital where Dr. Long performed carpal tunnel release surgery. Plaintiff was in the hospital a week. By the end of October, the carpal tunnel was well healed and she was free of symptoms in this regard.
Dr. Long was of the opinion that blunt, single trauma can cause carpal tunnel syndrome if the hand and fingers are hyperex-tended at the time of the trauma. He tended to believe plaintiff’s carpal tunnel syndrome was related to the accident, although he had not followed this matter until several months after the accident. Dr. Brown was of the opinion that blunt trauma is not one of the causes of carpal tunnel syndrome. His opinion that plaintiff’s condition was not related to the accident is supported by his finding of similar nerve reactions in both wrists. Dr. Dean testified that the contusion and pain plaintiff experienced initially in her wrist were not in the carpal tunnel area of her wrist.
Dr. Long continued to see plaintiff through January 1981 because of some con *528 tinued back and leg pain. Plaintiff was instructed to continue wearing the corset or back brace and to continue use of the TNS unit for pain relief.
Dr. Long was of the opinion that plaintiff was disabled from working at all until April 1980. It was his opinion that at time of trial plaintiff could not engage in any heavy labor requiring bending, lifting, or stooping, but that a more sedentary job would not cause plaintiff too many problems. He felt that while plaintiff might be able to resume her work as operator of the parish bookmobile, she could not return to her job with Red River Parish Council on the Aging where she did heavy housework and lifting. Dr. Long was of the opinion plaintiff would not require disc surgery if she led a relatively sedentary life.
Plaintiff’s testimony, corroborated by others, indicates that since the accident she is not able to do her own housework or care for her garden and yard as she used to. As of the time of trial in February 1981, plaintiff had not returned to either of her jobs.
During all of this time, plaintiff continued to see her regular doctor, Dr. Willis, in connection with her complaints of back and neck pain. From his bills in the record, it appears he treated her with injections. Dr. Willis advised plaintiffs employer on November 5,1979 that plaintiff was able to go back to work. However, as noted, she continued to be seen and treated by him after that date.
Plaintiff argues that all of her problems mentioned resulted from the accident, and that she is disabled from working in any capacity. Plaintiff seeks recovery for medical expenses, property damage, loss of earnings, loss of earning capacity, and general damages.
We conclude from the evidence that plaintiff suffered a cervical whiplash injury and mild traumatic neuroses which disabled her through March 1980. Drs. Long and Williams did not think plaintiff could return to work until that time. She also suffered a lumbar disc injury which causes her pain and discomfort and places some limitations on her work and earning capacity. That the disc injury is related to the accident is established by Dr. Long’s unequivocal opinion and the fact that lumbar symptoms manifested themselves shortly after the accident, leading Dr. Dean to call for a myelogram while plaintiff was under his treatment. There is really no evidence contrary to Dr. Long’s opinion.
We further conclude that the carpal tunnel syndrome was not caused by the accident. The contusion of the wrist suffered in the accident was in an area other than the carpal tunnel area. Drs. Brown and Dean did not believe it was related to the accident. Dr. Long, who related it to the accident, did not see plaintiff until about five months after the accident, and, even then, did not address the wrist problem until several months later.
The urinary tract problem was clearly unrelated to the accident.
Plaintiff was 48 years old at the time of the accident. She worked 16-20 hours a week for the parish as operator of the parish bookmobile and 16-18 hours per week for the Red River Council on Aging as a Homemaker II, at near minimum wage. She was disabled from working at either job through March 1980 and is entitled to recover the wages lost to that time, less sick pay received from the parish, which loss we calculate to be $1,050.56. She is entitled to recover wages lost from the Council on Aging job from that time to date of trial in February 1981, which we calculate to be $4,095.
The evidence is that plaintiff is able to work at jobs of a more sedentary nature. The parish offered her such a position, doing filing and the like in the office. No expert opinion evidence of the present value of plaintiff’s loss of future wages or earning capacity was introduced, but it is clear that her earning capacity has been reduced as a result of the injuries received in the accident. Although the amount to which she is entitled to recover for loss of future earning capacity is necessarily somewhat speculative, we award $5,000 for this item of damages.
*529 Plaintiff is entitled to recover the following medical expenses related to the accident:
Emergency room $ 30.00
Medical and Surgical Clinic, office visits and medication (Dr. Willis) 541.00
Huckaby Memorial Clinic (partial payment for 1/1/80-1/8/80 hospitalization and doctor’s fee) 140.00
Dr. Dean 140.00
Dr. Williams 590.00
Dr. Long (myelogram, $300, and office visits) 460.00
Doctors’ Hospital (2/23-3/1/80) 1,406.97
Doug Teitjen 604.00
Dr. Holton — Radiologist 78.00
Total $3,989.97
Property damage to plaintiff’s automobile is $547.46.
General damages are fixed at $25,000.
Recapitulating, plaintiff’s damages are as follows:
Medical expense $ 3,989.97
Loss of wages 5,145.56
Loss of future earning capacity 5,000.00
Property damage 547.46
General damages 25.000.00
Total $39,682.99
The judgment of the district court is reversed and set aside. Judgment is hereby rendered in favor of plaintiff, Annie Mae Jones, against defendants, Lemuel R. Hall and North American Van Lines, in solido, in the amount of $39,682.99, with legal interest thereon from date of judicial demand until paid, and all costs of this proceeding, including the cost of appeal.
Reversed and rendered.